## *In re* BUTLER'S ESTATE.

### (*Surrogate's Court, Rockland County.*   April, 1888.)

1. EXECUTORS—ACCOUNTING—INVESTMENTS.

A testator chose as his executors his brother and a business associate.   A few years after testator's death the executors made a loan, secured by mortgage, to the then surrogate, who had been testator's legal adviser and confidential friend.   The loan was of money already in the hands of the surrogate, and was secured, and interest was paid thereon for several years.   No loss occurred from any other of many investments made by the executors.   *Held,* that they were not liable for a loss resulting from making this loan.

2. SAME.

Where the payment of interest fell behind five years before a surviving executor began legal proceedings to recover the debt, at which time four years' interest remained unpaid, and the executor had made no inquiries as to the safety of the investment, he was liable for the loss of interest after the expiration of a year from the time the first default in payment of interest was made, at which time the principal was past due, deducting four months during which the debtor was dangerously ill, and two months from the time of his death to the granting of letters of administration on his estate.

3. SAME.

The principal and interest of a loan amounted to $9,500.   On foreclosure of the mortgage to secure it, the property was purchased by the executor's attorney for $3,200, and was thereafter sold by him for $5,000.   *Held,* that the executor was liable for the difference between the purchase and selling price, with interest, less expenses up to the time of the $5,000 sale.

4. SAME—SERVICES AS CLERK.

An executor is not entitled to credits for clerk hire, where the evidence does not show payments to a clerk, but a retention of funds by the executor for services performed by himself as clerk.

5. SAME—ATTORNEY'S FEES.

Where the contestants by writing authorized an executor to pay their attorney a certain fee, the executor is not entitled to credit for a further sum paid the attorney, more than five years thereafter, for the payment of which no other authority is shown.

6. SAME—COMMISSIONS.

Payment by one executor to his co-executor of commissions cannot be allowed him, as commissions must be judicially allowed.

7. SAME—PAYMENTS TO MINORS.
The executor is entitled to credit for a payment made to a minor legatee, just before she became 21 years of age, to provide her a "wedding outfit," which it does not appear she was able to obtain otherwise, where she long acquiesced in such payment, and does not claim that it was not for necessaries.

8. SAME.
Where an adult legatee assents to payments made to him while a minor, the executor should be allowed credit for such payments.

9. SAME.
The executor is entitled to credit for payments made for the burial expenses of a minor legatee, though they were made direct, without waiting for the grant of letters of administration.

10. SAME.
Payments of cash to a minor legatee for whose support there is ample provision, the purpose of which payments is not explained, and for which no receipts are shown, are not allowable to the executor.

11. SAME—INTEREST.
Executors are not chargeable with interest on balances of income in their hands at the end of each year, which were not mingled with their own funds, unless such balances were so large as to make it clear that they would not be needed in carrying out the purposes of the will.

12. SAME.
The executors are chargeable with interest on a loan with annual rests, where the interest was not paid annually.

13. SAME—DECEASED EXECUTORS.
Laws N. Y. 1884, c. 399, § 1, amending Code Civil Proc. N. Y. § 2606, provides that, where an executor dies, the surrogate's court has the same jurisdiction to compel his executor to account which it would have had against the decedent had his letters been revoked, and can compel the executor of the deceased executor "to deliver over any of the trust property which has come to his possession or is under his control." 2 Rev. St. p. 84, § 13, (8th Ed. p. 2558,) provides that the naming of any person as executor shall not discharge or bequeath any just claim which the testator had against such executor, but he shall be liable for the same as for so much money in his hands at the time such debt or demand became due, and he shall apply and distribute the same as part of the personal estate of the deceased. Held, that a surrogate court can compel an executor of a deceased executor to account for any trust property received by the latter, and can therefore compel him to account for a just claim against his decedent held by the original testator at his death, on its becoming due, as "so much money."

Accounting by Alfred M. Wiles and John Butler, executors of the will of Patrick Butler, deceased. Laws N. Y. 1884, c. 399, § 1, amended Code Civil Proc. N. Y. § 2606, so as to read as follows: "Where an executor, administrator, guardian, or testamentary trustee dies, the surrogate's court has the same jurisdiction, upon the petition of his successor, or of a surviving executor, administrator, or guardian, or of a creditor, or person interested in the estate, or of the guardian's ward, to compel the executor or administrator of the decedent to account, which it would have against the decedent, if his letters have been revoked by a surrogate's decree. * * * The surrogate's court has also jurisdiction to compel the executor or administrator at any time to deliver over any of the trust property which has come to his possession or is under his control, and, if the same is delivered over after a decree, the court must allow such credit upon the decree as justice requires."

*Edward Wills* and *John Croak*, for executors. *Calvin Frost*, for contestants. *Abram A. Demarest*, guardian *ad litem*, for minor contestants.

WEIANT, S. This accounting was commenced before the late Surrogate SUFFERN, in the year 1875, and the matter was sent to an auditor, before whom a considerable mass of testimony was taken. The last hearing before the auditor appears to have been had in November, 1876. After that date the proceeding seems to have been allowed to sleep until revived in the spring of 1886. In the mean time John Butler, one of the executors, died; also John and Richard Butler, legatees, and children of the testator. Proceedings were then had by which Anastasia Butler, the executrix of the will of the deceased executor, was brought in as a party. Administrators of the respective estates

of Richard and John Butler, deceased, were duly appointed, and made parties to this accounting. The auditor, by consent of all parties, made a report to this court of his proceedings, with the testimony taken by him, and thereafter the accounting proceeded before the court, and the cause is now submitted for final determination. The matter having been pending this great length of time, and to a very great extent before another surrogate and his auditor, and having proceeded with much irregularity, the accounts being made up of the old one, supplemented by an additional account, parties having deceased, and the affairs of the estate having generally become confused and complicated, puts the matter in an unsatisfactory shape to dispose of in an orderly and systematic method. And the cause having been submitted to me by counsel rather with the purpose of having the court determine certain specific questions than to make at the present a full and systematic disposition of the matter, leaving the question of figures and details for adjustment on the settlements of the decree, I shall therefore confine myself to an examination and determination of the questions submitted. I shall consider these questions somewhat in the order that counsel have presented them.

The first claim made by the contestant's counsel is that the executors should not be credited with the loss on the loan to Judge Suffern upon his bond and mortgage of the date of November, 1874, for $7,500. This matter I shall consider in two respects: *First.* Is it shown that the instrument considered up to the time of the completion of the loan was made under such circumstances as to show that a loss resulted therefrom for which the executors should be held liable? *Second.* Is it shown that the conduct of the executors subsequent to the making of the loan was such as to make them liable for the loss, and, if so, to what extent? The rule of responsibility of trustees is that the trustee is bound to exercise such diligence and such prudence in the care and management of the estate as, in general, prudent men of discretion and intelligence in such matters employ in their own like affairs. *King* v. *Talbot*, 40 N. Y. 76–85.

As to the first of the above inquiries, after careful consideration, I have arrived at the conclusion that the executors should not be held liable for the loss, if any, based upon the claim of lack of that degree of care and prudence which the law imposes upon one acting as a trustee. The burden of proof to sustain this issue rests upon the contestants, and, under all the circumstances, I am inclined to the judgment that the proof has not reached the requisite point of clearness, and my mind is not brought to the conviction that the executors should be held liable for such loss, if any. One of the executors was the brother of the testator; the other, his chosen friend and business associate. It is right to assume that the testator had selected them to administer his estate because of his confidence in their integrity, business capacity, and experience, and that he regarded them as men of fidelity, diligence, and prudence. At the time of making this loan in 1874, only a few years had elapsed since the testator's death, and there is no evidence of nor claim made that they were not men of the same methods of business, care, and prudence as at the time of the testator's death. The loan was made to the legal adviser and confidential friend of the testator. He was the surrogate of the county, and one in whom the executors had a right to place explicit confidence, and upon whom they might rely to speak the truth, and to permit them to commit no error in the management of the estate, at least wherein he was a participator; and while granting that, in this matter, it was an improper thing for the executors to loan to the surrogate, and for him to receive, the same, still, upon the question of good faith and prudence, it must go very far in excuse of the conduct of the executors that they believed they were entitled to make the loan, and to place perfect reliance upon and confidence in the surrogate. They had a right to expect that the surrogate would check them in any wrongful administration of the estate wherein he was an actor; still more not

to lead them into the commission of an act that would impose a loss upon the estate, or upon the executors personally. Of course, in this loan it cannot be contended that in law, or as matter of propriety, this transaction between the surrogate and the executors was not reprehensible; but these executors were laymen, and when those who have special knowledge, experience, and men in legal authority lead the advance, and no one calls a halt, would it not be a too stringent application of the rule of responsibility to hold these executors personally liable for the loss, if any, which may have come to the estate because of the investment originally? There is grave doubt whether loss resulted from imprudence in making the instrument. It is rather to be attributed to subsequent lack of diligence and care.

The safety of the investment was somewhat confirmed by the prompt payment of the interest thereon for several years, and confirmatory of the judgment of the executors that the value of the property was sufficient at the time to secure the loan. Again, it must be remembered that this security was taken for moneys which had come to Judge Suffern's hands as the result of an action commenced by the testator himself. The moneys had never been in the hands of the executors. They obtained security for that which therefore was not secured. Another circumstance showing the prudence of these executors is the fact that, in making loans for the estate, no loss has come to the estate out of any other of the many investments made by them.

As to the second inquiry, I am of the opinion that a loss has resulted from the failure of the executor Wiles to exercise that degree of diligence required of him in looking after this investment. The executors, even though the security was sufficient at the time of making the loan, were not relieved from exercising supervisory care over the investment thereafter. They were still bound to be watchful; to keep themselves informed as to whether or not a depreciation in value of the security was taking place from any cause; to see that the interest was paid with a reasonable degree of promptness; to keep informed as to the pecuniary responsibility of the obligor; and, in fact, to keep themselves informed, and to take notice, of all these things affecting the investment which a man of fair judgment, care, and prudence would take and keep into consideration in a matter of a loan of his own money, and likewise to take all lawful means, with a fair degree of promptness, to recover the debt, and thereby, and by all prudent means, prevent a loss coming to the estate. Herein I think the evidence shows that the executor Wiles has clearly failed in his duty. As early as the year 1877, Judge Suffern began to fall behind in the payment of interest. While the interest was payable semi-annually, he did not pay the interest due November, 1877, until May, 1878. Interest accrued from November, 1877, to the time of the judge's death, in March, 1881, a period of upward of three years; and on account of which was paid, according to the accounts, at different times and in various sums, in the aggregate about $557, the last of which seems to have been paid more than a year prior to his death; thus leaving unpaid, when the last payment was made in February, 1880, more than two years' interest. This falling behind and neglect to pay, as heretofore, was something to put the executor upon inquiry as to the safety of the investment, yet he appears to have made none in any respect. His attempt to collect seems to have been limited to demand only. No legal proceedings were taken to enforce payment until October, 1882; thus leaving some four years' interest unpaid before legal measures were taken to recover the debt. This long delay is inexcusable. Nothing is offered that can be taken as a sufficient explanation of so long delay. Even if it be granted that the executor was not called upon to initiate legal proceedings to enforce payment immediately upon default of payment of the interest, on the other hand the limit of delay is not indefinite. Between these two extremes lies the medial line, where the law says the executor should, in the exercise of ordinary prudence, go forward to protect the trust-estate, or, in de-

fault of so doing, become personally responsible. When this line is reached must depend upon all the circumstances of the case under investigation. In this matter no other reasonable conclusion can be reached than that the executor has incurred a personal liability. I think a year's delay, in view of all these circumstances, among others the fact that the principal was past due, amply sufficient time for delay of legal proceedings. This period was reached about November, 1879. From that date up to the time of the commencement of the foreclosure (November, 1882) I think the executor should be held for the loss of interest, at least, upon the value of the mortgaged premises, which I fix for this purpose at the sum of $4,000. From this period, however, should be deducted the time of the illness of Judge Suffern, when his sickness was of such character that, under the advice of his physicians, it was dangerous to press business matters upon him. The executor was not called upon to violate the common rules of humanity. I think that he is excusable for the delay covering that period, and which I fix, as nearly as the evidence will enable me to do so, at four months. The period reaching from the date of Judge Suffern's death to the time of granting letters of administration on his estate should also be excluded. I do not think the delay (about two months) was such as to call upon the executor to force the application for administration.

I am of the opinion, also, that the executor should be held for the difference between the price at which the mortgaged premises were knocked down at the sale, being $3,200, and the price at which the same were subsequently sold, ($5,000,) and the interest such difference has since earned, deducting the expenses incurred in bringing about the sale of the $5,000 and other expenses, such as taxes, up to the time of the sale. If Mr. Wells bid as agent or in behalf of Mr. Wiles, then, under the well-settled rule that one acting in a fiduciary capacity cannot deal with the trust-estate to his own personal benefit, applies, and the purchase must be deemed to have been made for the trust-estate, and Mr. Wiles must charge himself with this profit. 3 Redf. Wills, 234, 403. On the other hand, if the executor entertained the judgment that he always claimed that he did as to the value of the mortgaged premises, then the exercise of proper care for the estate, I think, called upon him to purchase the property for the estate, and thus prevent a loss which in a measure might have been averted. His attorney regarded it as a "pity that the property did not bring more," and therefore took occasion to purchase the same, and if he purchased for himself it must have been because he thought it a speculation to do so at the extremely low price at which it was being sold. Here was property that the executor, unless he confesses his own delinquency, believed to be fair security for $7,500 principal, and upwards of $2,000 interest, or an aggregate of upwards of $9,500, which he permits to be sold for $3,200, and, standing by, neglects, in the exercise of a discretion vested in him, to purchase the property in behalf of the estate, and in view of the heavy loss that must come to the estate if he permitted the same to go to a stranger. 3 Redf. Wills, 234, and cases there cited. Id. 555. Indeed, it was his duty to purchase under the circumstances. *Clark* v. *Clark*, 8 Paige, 152.

Objection is made to the credits for clerk hire. I think the exception is well taken. The evidence does not show payment to a clerk, but a retention of funds by the executor Wiles for his own services in that respect. No vouchers or receipts are produced, as required by section 2734 of the Code. In such case payments for clerk hire are not allowable. *Lent* v. *Howard*, 89 N. Y. 179, and cases cited. In *Collier* v. *Munn*, 41 N. Y. 143, compensation was refused an executor for legal services that he had rendered the estate, and in *Clinch* v. *Eckford*, 8 Paige, 412, compensation to an executor for services rendered by him as clerk was disallowed. The reason of the rule precluding such allowances is equally applicable, even though the firm of A. M. & W. H. Wiles were compelled to hire a clerk to perform the services

which the executor might have performed if he had not performed these services for the estate. This is only an indirect method of compensating the executor.

I am convinced that the affairs of the estate were such as to permit the executors to employ a clerk, and to charge the estate with payments therefor, and I am not prepared to hold that the fact that the accounts have not been kept in a skillful form would preclude the allowance of the payments, if they had been made to a clerk; but no clerk is shown to have been employed or paid. The executor rendered this service, and I am bound by the authorities to disallow any claim of compensation therefor. As was observed by Judge WOODRUFF in *Collier* v. *Munn, supra:* "With the unreasonableness of the resistance to this claim of the appellant, which, in this case, is for a valuable service, rendered in good faith, far beyond what his duties as executor required, or with the eminent propriety of payment * * * for a service from which they have apparently derived so considerable a benefit, we cannot deal."

The payments to Mr. Hoffman, counsel for the contestants, in excess of $500, do not seem to have been made by their authorization, and cannot, therefore, be allowed. The first $500 was paid under written authority; the others not. Why did not the executors require the like authority as to the others? It appears to me that they should have required clear direction or permission, in view of the fact that they were paying the attorney of the adverse party. More than five years elapsed between the last payment of the first $500 and the first payment of the last $500. This disconnects the latter payment from the order under which the first $500 was paid. The letters and receipts of Mr. Hoffman submitted to me rather indicate that these latter payments were not made under any authority, but were for services rendered the executor Wiles in prosecuting the claims against the executor John Butler. As to these payments, the burden is upon the executors to establish authority to make them, and I do not find sufficient evidence of it. If there were, I should allow them, as the loss to the executor is an unfortunate one, which justice calls upon the court to prevent, if possible; but I think that the matter is one that I should have clearly established, inasmuch as the payments were to the adverse attorney. Of course, I have nothing to do with the amount of compensation that Mr. Hoffman should have from his clients.

The payment by the executor Wiles to his co-executor for commissions cannot be allowed. It is a well-settled rule that commissions cannot be paid or retained until judicially allowed. *Wheelwright* v. *Rhoades*, 28 Hun, 57; *Trust Co.* v. *Bixby*, 2 Dem. Sur. 494; *Freeman* v. *Freeman*, 4 Redf. Sur. 211. And if retained or paid, the executor is liable for interest thereon. *In re Peyser*, 5 Dem. Sur. 244. The matter of proportioning the commissions as between the executors, so as to protect the executor Wiles against this error, may be adjusted on settlement of the decree.

Objection is taken to the allowance to the executors of certain payments made to the legatees John and Richard Butler and Honora Dinan, because of the same having been made while these legatees were infants. These items are $500 to Mrs. Dinan, October 20, 1875; items aggregating $6,259.98 to or for John Butler, between August 10 and November 22, 1875; and to some 20 items to or for Richard Butler, aggregating $1,232.90, of which $441.50 was paid by the executor Butler, and the balance, of $791.40, by the executor Wiles. The payment to Mrs. Dinan was made by the executor Wiles just prior to her arrival at 21 years of age, for her "wedding outfit." I think that she does not claim that the payment was not one for necessaries. This being so, it is allowable, within the rule cited by her own counsel from *Hyland* v. *Baxter*, 42 Hun, 9. It does not appear that the widow, Mrs. Butler, was either able out of the income or willing to make this provision for Honora's marriage. Besides, her failure to repudiate the payment, and long acquies-

cence in the same, should preclude her, at this late day, from repudiating the payment.

The payments to John Butler should be allowed to stand as stated in the accounts, if for no other reason than that while this account was pending he expressly assented to the same in writing, and thereafter received other payments based upon the provisions of such writing. I think his administratrix is barred by his acts in that respect, inasmuch as no claim of error or mistake is made. The sole ground of objection being infancy at the time of payment, these payments were thus confirmed by him after he arrived at maturity. The executor Wiles should receive credit for all of these payments made by him, as also the executor Butler for his payments, except as to such payments as were made out of or on account of the proceeds of the $30,000 mortgage or other alleged indebtedness, or connected therewith, which payments should stand over, as hereinafter indicated, as to like payments made to Mrs. Dinan.

As to Richard Butler, of the amount of $791.40 paid by Mr. Wiles there were three items, aggregating $14.25, which seem to have been for necessary traveling expenses and physician's bills. These should be credited. The balance of the sum appears to have been paid for Richard's burial expenses. As to these items Mr. Wiles had no legal right to make such payments upon the death of Richard. He should have ceased paying on account of his estate until the appointment of an administrator therefor, who would be authorized to receive Richard's estate, and out of the same to pay the burial expenses. Instead of so doing, the payment was made direct by Mr. Wiles. This avoided circumlocution, but was not in accordance with legal requirement. The payments were no doubt made in good faith, and in equity Mr. Wiles should be reimbursed. Can he be allowed to retain the same out of Richard's estate, or must he pay the whole estate to his administratrix, and then seek reimbursement from that source? The expenditures are not challenged on any other ground than infancy. Surely the necessity of incurring burial expenses cannot be controverted. The amount is not attacked as excessive, and if they were, the extent of his estate, he being unmarried, and being a minor and but having no creditors, I think the expenses cannot be said to be too large. I cannot, therefore, escape the conviction that justice and equity call for an allowance of these payments. It has been held that the strict legal rules are not inflexible as to such expenditures, and that in case of a departure from his legal duty by a trustee in the event of entire good faith, and when there are equities in his favor, and the expenditures have been made to serve the necessities of the minor, equitable considerations will be applied to reimburse the trustee. *Hyland* v. *Baxter*, 42 Hun, 9, 98 N. Y. 610.

I think here may be found the basis for an allowance of the payments, and a retention of the same out of Richard's estate. No injustice will be done to any party by so doing, and the payments are accordingly allowed.

As to the payments made by the executor Butler, I am not convinced of their necessity, except as to the items for clothing and tuition. No vouchers are produced, and no evidence as to the purposes of the payments has been adduced, except such as may be discovered from entries in the accounts. Nothing appears to show the purposes for which the moneys were paid. Most of the payments were cash to the minor. These items should have been explained, for the executor had no legal right to make them. He could only be justified on equitable considerations and grounds of the minor's necessities. The executor was certainly not at liberty to hand over money to the minor without knowing of and approving the purposes for which it was to be used. *Kelaher* v. *McCahill*, 26 Hun, 148. Especially in this matter is the executor called upon to establish his claims for these allowances by the clearest proofs, inasmuch as the testator contemplated by his will the making of ample provisions for the support, maintenance, and education of his children, through the provisions for payment of all income to the widow to be applied by her for all

these purposes. Again, no receipts for the moneys paid to Richard are produced, and in view of the evidence touching the $30,000 mortgage and the book-account, and as to payments therefrom to Mrs. Dinan, and the declared intention of the executor Butler to pay the children their respective shares of the same, it may be that these payments to Richard were gratuitous, for which the executor intended making no charge, or that they were payments on account of these claims. The fact that during this time the executor Butler claimed that he had no funds of the estate in his hands unless he was indebted on these claims is confirmatory of this view. I think these payments to Richard should be disallowed, except those for clothing and tuition.

I am of the opinion from the evidence that the payments made by the executor Butler to Mrs. Dinan were made out of the proceeds of the $30,000 mortgage, or because of the receipt thereof by him. He took no receipts for the payments, which gives the impression that he did not pay as executor, especially when, leaving out of consideration the mortgage moneys or the book-account, he had no estate funds out of which to pay. But, as there is an action pending to recover the $30,000 from the estate of the executor Butler, I think these payments to Mrs. Dinan should stand over for allowance or disallowance, either in that action or in a final judicial settlement of the estate.

The contestants object, also, to the allowance of certain payments not appearing in the accounts, but testified to by the executor Wiles, on July 1 and July 2, 1887, to have been made by his firm for the estate to the legatees. They are as follows: One hundred and fifty dollars to John Butler, legatee; and this, I think, should be allowed. But has not credit been given in the account by the payment of $200 credited on the same day? Two hundred dollars to Mr. Hoffman, December 19, 1876, and $210 to him March 19, 1877,— these being payments to the contestant's counsel,—the first of which has been allowed as part of the $500 order, and the latter, being one of the payments in excess of that sum, must be disallowed, for reasons above assigned as to other unauthorized payments. I may here add that I have not nor do I consider the *status* of the claim of Mr. Hoffman as against his clients for compensation. There is no check for a payment of $200 to Bridget Butler, November 21, 1876. There is one February 21, 1876. The executor, however, is credited for a payment of that sum in his accounts on the same date, and I believe it to be the one made by the check of A. M. & W. H. Wiles. But one receipt is produced. The payment of $81.09 to John Butler is sustained by his receipt, but it is already credited in the accounts. The $200 to Mrs. Butler, September 26, 1876, I think must be allowed; as also $500, August 8, 1881. They are sustained by vouchers. The former is known already, credited in the account, and may not the latter payment be included in the $800 credit of the same date? If not, there is no voucher for it. I do not see that the payment to Mr. Wiles of $200, August 23, 1881, and $150, March 9, 1881, on the "Murkey" investment, are to be considered, as the executors may have already been once credited with the funds invested in the security. I shall not pass upon these items at present, but reserve them until settlement of the decree. A payment to Mrs. Butler of $500, July 24, 1882, is already credited in the accounts, and a voucher filed therefor. I think this must be the same. The payment of $75 to C. P. Hoffman, June 3, 1884, has already been disallowed.

We come now to the consideration of the questions of interest with which the contestants claim that the executors should be charged.

The first of these claims is that the executors should be.charged with interest on the balances of interest in hand at the end of each year in excess of the balance in bank. This proposition assumes, as matter of fact, that the evidence shows such balances. I am not so convinced. Mr. Wiles testifies that all moneys collected by him were deposited in the executor's bank account;

that none of the funds were mingled with his individual or firm moneys, or used by himself or by his firm, excepting the loans, which will hereafter be considered. The schedules submitted by contestant's counsel to show balances apply a rule that for rigidity is not sustained by any authority. It is assumed that every dollar of the estate funds was continuously invested, whereas, in fact, there was, according to the testimony, and according to all experience must necessarily be, intervals between receipts and investments or opportunity to invest. It is further assumed that all interests, rents, or other income were received on the very day whereon they were payable, while the evidence shows the contrary, and it would be a most remarkable administration if it were otherwise. It is assumed, also, that no losses have come to the estate. The evidence shows a considerable loss on the Suffern mortgage. In fact, everything is assumed against the executors. But if there were balances, unless they were considerable, and it were very clear that the executors would not be called upon to pay the same over to the widow, Mrs. Butler, under the provisions of the will, it would be a harsh and unjust rule that would charge them with interest on such balances. If it so happened that at the end of any year there remained a surplus of income, I do not see that the executors were bound to invest at once. To so hold would preclude the application of the income of one year to the needs of the family for another, no matter what the exigency that might call for so doing. I do not think that the testator contemplated such limitation. His intention, as gathered from the will, was to make liberal provision for the needs of his family. Indeed, I cannot see that, so long as the executors did not mingle the estate funds with their own, or use or apply the same to their own personal benefit, why they should not hold balances of income without being chargeable with interest, unless they became so large as to make it perfectly clear that they would not be needed to meet any exigency calling for an increase of expenditures for the necessities of the family. It must be remembered that in the course of family affairs—and in this case it was an experienced fact—that as the children advance in age the expense of maintenance and education increases. I am not, as now impressed, disposed to charge the executors with interest under this claim.

As to the claim that there were uninvested balances of principal funds, and that the executors should be charged with interest on the same, I cannot so hold upon the proofs; certainly not, unless some *data* are submitted to me based upon the proofs, showing such balances, and that opportunity to invest was offered, or that the executor himself used the funds, if such they were, or in some other way disposed of them to his personal benefit. Mr. Wiles denied all of these propositions or allegations, and no one contradicts him, except as to opportunity to invest, by Mrs. Butler; but Mr. Wiles says that he had no funds to answer such demand. Besides, these applications were made, some of them at least, while these proceedings were pending, and I think he could properly refuse, and hold the funds in the trust company, as he did, to await the determination of this accounting. If Mr. Wiles is in error about there being no uninvested balances, it must appear from an investigation of the investments at stated periods; but, until such appears to be the fact, I must assume that there were none, except during short intervals, awaiting investment. The cases cited by the learned counsel for the contestants do not sustain his contentions in these matters. The principles enunciated in them are sound and salutary, as applicable to the particular case determined. No general principle can be laid down that will be applicable to all cases, and indeed scarcely in a second case, because of the diversity of facts and circumstances. As was said by Mr. Justice CHURCHILL in *Thorn* v. *Garner*, 42 Hun, 507–515, there is no uniform rule of redress in cases of this kind, but each calls for the exercise of the judicial discretion of the court. The rule laid down in *Spear* v. *Tinkham*, 2 Barb. Ch. 211, was one of justice, as applied in that case.

But in that, the estate funds had been intermingled and loaned by the executor with his own moneys, and no estate accounts kept. These elements do not enter into this case. So in *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620, the administrator held the funds of the estate several years, amounting at times to upwards of $50,000. He could have distributed the estate, in whole or in part, after a year, although the court allowed him two years. He could have placed the funds where they could have been productive to the heirs. He did neither, but employed the moneys in his own business, or in making large loans for his own benefit, kept no accounts, and mingled the funds with his own. *King* v. *Talbot*, 40 N. Y. 76, is not in point. That was a case of unauthorized investment, and the *cestui que trust* had his election to take the investment with profits, or to hold the executors as for so much of the estate funds loaned to their personal benefit and the interest that might have been earned therein. In the case of *Shepard* v. *Patterson*, 3 Dem. Sur. 183, there was no excuse for the failure to invest, as the will directed a deposit of the funds in a savings bank. The executor refused to obey this specific and clear direction, and was held liable for such interest as the moneys would have earned in such a bank. In *Rundle* v. *Allison*, 34 N. Y. 180, and *Gray* v. *Thompson*, 1 Johns. Ch. 82, the trustee was held liable for interest for failure to pay over funds, and this holding was based upon the presumption, in the absence of proof to the contrary, that the fund had been appropriated to his own use. That is not this case. Indeed, no case has been cited, wherein the facts were similar to this, where the trustee has been charged with interest, nor have I found any such case. In all the cases where the trustee has been held liable for interest of funds in his hands, one or more of the elements or facts of personal use of the funds, mingling of the same with private moneys, unauthorized investments, failure to follow clear and specific directions as to the disposition of funds, retention of the funds where there was no reasonable excuse for so doing, or other circumstances showing a clear case of negligence, were present. In this case, all of these elements are absent as to claims of interest on the balances, if any, in the hands of the executor.

As to the loans made to the firm of A. M. & W. H. Wiles, the executors must be charged with interest on the same, with annual rests, except in cases of payments on account exceeding interest due at the time of payment, in which instances rests must be also had at the time of any such payment. The rate of interest should be 7 per cent. to January 1, 1880, and 6 per cent. thereafter. But upon so much of the debts as was paid by the deposit of the $6,000 in the trust company, June, 1886, the estate is entitled to only interest at the rate earned in that institution. This proceeding was then pending, and the executor was justified in holding the funds in readiness to abide the determination of this accounting, and therefore was excused from making a permanent investment. This, it seems to me, the contestants have a right to claim, and is no more than compensatory. The executor has no just ground to complain of this ruling. It is no answer to say that, if the interest had been paid annually, it might have remained uninvested, for the firm neglected making the payments, and thus cut off the opportunity to invest. The following authorities sustain the conclusion I have reached: *Jones* v. *Foxall*, 15 Beav. 388; *Morgan* v. *Morgan*, 4 Dem. Sur. 353.

The claim that the executor Wiles is liable for any moneys due from his co-executor has not been pressed, and I therefore dismiss that question without consideration.

I come, now, to the claim that the executrix of the will of John Butler, the deceased executor, who was brought in as a party to this proceeding, should be charged in this accounting with the indebtedness of her testator to this estate. Prior to the amendment of section 2606 of the Code of Civil Procedure in 1884, it was settled by authority that an executor of a deceased executor could be called to an account only for, and directed to pay over, such as-

sets as were shown to have come into his possession or under his control. *In re Fithian*, 44 Hun, 457. See surrogate's opinion. It was held further, in *Re Fithian, supra*, that the effect of the amendment of 1884 is to confer jurisdiction to compel an executor of a deceased executor to account for any trust property received by the latter. The saving provision in the amendment, as to the effect of the decree, lends corroboration to such construction. I shall therefore adopt this construction upon the authority cited, without further consideration of the question. It is provided by statute that "the naming of any person as executor in a will shall not operate as a discharge or bequest of any just claim which the testator had against such executor, but such claim shall be included among the credits and effects of the deceased in the inventory, and such executor shall be liable for the same as for so much money in his hands at the time such debt or demand became due; and he shall apply and distribute the same in the payment of debts and legacies, and among the next of kin, as part of the personal estate of the deceased." 2 Rev. St. p. 84, § 13, (8th Ed. p. 2558.) Thus it seems that if the testator, Patrick Butler, had at the time of his death a just claim against the executor Butler, then he was liable for the same "as for so much money in his hands" at the time the debt became due, and he was bound to apply the same "as part of the personal estate of the deceased." It seems, from the specific language of the statute, that such claim, if "just," was thus made assets in the hands of the executor, as much as though a claim against another debtor had been paid to him. The statute was so construed in *Barcus* v. *Stover*, 89 N. Y. 1. The question of the justice of the claim, it has been held, may be tried in a surrogate's court. *Everts* v. *Everts*, 62 Barb. 577. It seems then to follow that the rule laid down in *Re Fithian, supra*, is applicable, and the executrix of the deceased executor, Butler, must account for the claim, if established as just, as if so much moneys of the estate had been in the hands of her testator at the time of his death.

But can the question of the justness of the claim be litigated in this court, and in this proceeding, after the death of the deceased executor? Section 2606, as amended, provides that this court shall have the same jurisdiction to compel the executor of the deceased executor to account which it would have against the decedent if his letters have been revoked by a surrogate's decree; and by section 2724 *et seq.* it is enacted that, in case of the revocation of letters, power is given to give a full accounting, as in other cases of judicial settlements. So that it would seem that, if the debt were due prior to the death of the executor Butler, the same had then become assets in his hands, and that his executrix might be called upon to account for the same in like manner as her testator might have been if living, and his letters had been revoked. In such case he would have been obliged to litigate the question of the justice of the demand in this court, and to give force to the provision quoted above from section 2606. It would follow that the executrix must also try that question here. Furthermore, this claim was litigated in this proceeding without objection, during the life-time of the executor, and most of the testimony bearing upon that question taken while he was still living. I shall, however, defer finding upon the question of the establishment of the claim until the settlement of the decree. The pleadings in the action brought against the estate of the deceased executor are not before me, and I am not, therefore, advised whether or not this claim of $9,000 is sought to be recovered in that suit. I think that the whole matter of debits and credits of the deceased executor should, if practicable, be disposed of as one subject-matter, and in the same proceeding or action, either upon a continuance of this accounting or in the pending action.

As to the written agreement or stipulation entered into between the legatee, John Butler, and the executors, June 11, 1877, I think it should be given

effect agreeably to its terms. It is but a stipulation entered into in a pending cause which established certain facts without further proof or contention, and as a basis of settlement, according to its terms. So far it is binding, and no further. It is not, nor does it purport to be, a general release. I must hold it binding like any other agreement, as there is no attack made upon it because of fraud or other vitiating cause, and no proof has been given to sustain any such claim. The addition at the foot of the writing indicates clearly that no matters not entered in the accounts were considered, and, even as to those in the accounts which are clearly or concededly mistakes, the same are left open for correction in this accounting. All of such will be adjusted upon settlement of the decree. I have now given consideration to all questions that have been submitted to me by counsel, and made such disposition of them as the rules of law and equity applicable to the matter, when applied to the facts of this cause, have seemed to me to require. I may add that, in considering these questions, and in arriving at conclusions, I have attributed to the executor Wiles entire good faith in the administration of the estate. I believe that it has been his purpose to be faithful to the trust imposed upon him by the testator, and to carry out the wishes of the testator as to his widow and children. He has fallen into some errors, unfortunately for himself, but this is not surprising when wiser heads, learned in the law, and of full experience, have not only permitted him to stray, but to an extent led the advance, into the way of error. Nor do I think that the widow or legatees or their representatives believe that Mr. Wiles has not acted fairly, honestly, and in good faith towards their interests. I do not believe that either of them is willing to say, after a retrospective view of the administration of the estate and its settlement, that the friend of the testator, and the life-long neighbor of all of them, has not acted with honesty and in uprightness, and that his mistakes were intentional errors. The case is one where both sides should have costs, and I shall grant the same accordingly. Let each side present a bill for taxation. A decree may be presented for settlement by either party upon notice, in accordance with the conclusion I have reached.